## Commonwealth *vs.* William P. Eastman and others.

It is in the discretion of the court, in which an indictment is pending, to quash it, or to leave the defendant to a motion in arrest of judgment, and the refusal to quash an indictment is not a proper subject of exception.

An indictment ought not to be quashed, in a doubtful case, but only when it is clearly insufficient to sustain a judgment against the defendant.

In order that the papers and letters of an insolvent debtor, produced by his assignee, may be competent evidence as coming from the possession of the insolvent, it must be shown that the assignee received them from the messenger, and that the latter took possession of them under his warrant, as papers relating to the estate of the insolvent

Letters addressed to a party, and found in his possession, are not evidence against him of the matters therein stated, unless the contents have been adopted or sanctioned by some reply, or statement, or act done, on his part, and shown by other proof.

Where one of two persons, who had examined and appraised the assets of an insolvent debtor, was called as a witness to the value thereof, and produced a paper signed by himself and his associate, containing the results of their appraisal; it was held, that such paper could not be read to the jury, as the joint certificate of the witness and his associate, without first calling the latter to testify to its accuracy.

An indictment for a conspiracy alleged, in the first count, that the defendants conspired together to cheat and defraud P. S. S. of his goods; in the second, that they conspired to get the goods of P. S. S. into their possession, under color and pretence of buying the same; and, in the third, that they conspired to get possession of the goods of P. S. S., upon trust and credit, and then to remove the same out of the commonwealth: On the trial of this indictment, evidence having been given of a purchase of goods by the defendants of P. S. S., ostensibly for cash, but, in fact, on the short credit resulting from the indulgence usually allowed on cash sales : — it was held, that the prosecuting officer might inquire of a witness, whether, at the time of the sale, the standing and credit of the defendants were such, that they could have bought goods on credit; — also, that other purchases of goods, made by the defendants of other persons, at about the same time, and under the same circumstances, with the purchase of P. S. S., were admissible in evidence, to show the nature and extent of the defendants' business, and to prove the criminal intent alleged in the indictment; — also, that evidence of the defendants' having obtained bills of lading, about the same time, and forwarded them to their correspondents in other places, accompanied by drafts thereon, before the goods described in such bills of lading had been in fact purchased, was admissible to prove the criminal intent.

It is competent for a party, after having closed his case, so far as relates to the evidence, to introduce additional evidence, by the cross examination of the witnesses on the other side, for the purpose of more fully proving his case.

Where handwriting is to be proved by comparison, the standard used for the purpose must be a genuine and original writing, and must first be established by clear and undoubted proof: Impressions of writings, taken by means of a press, and duplicates made by a copying machine, are not originals, and cannot be used as standards of comparison.

Where several persons are jointly indicted and on trial, the submitting of the case of one of them to the jury, by itself, in the course of the trial, at the instance of the other defendants, in order that such defendant, if acquitted, may be called as a witness by them, is a matter peculiarly within the discretion of the presiding

judge, and depending upon his view of the evidence; to be allowed, where there is no evidence against the party, and to be refused where there is such evidence, although, in the opinion of the judge, it may be altogether insufficient for a conviction.

The obtaining of goods on credit, by an insolvent person, without disclosing his insolvency, and without having any reasonable expectation of being able to pay for such goods, in and by means of the fair and ordinary course of his business, is not of itself such an unlawful act, as may be the subject of a conspiracy; though, it would be otherwise, it seems, in the case of a purchase made without any expectation of payment.

The obtaining possession of goods, under the pretence of paying cash for them, on delivery, the buyer knowing that he has no funds to pay with, and appropriating the goods to his own use, in fraud of the seller, is such a fraud or cheat, as may be the subject of a conspiracy.

In an indictment for a conspiracy to do an act, which is a well known and recog nized offence at common law, the object of the conspiracy may be described by the general terms, by which it is familiarly known; if the alleged purpose be the doing of an act, which is not unlawful in itself, but which is to be effected by the use of unlawful means, those means must be particularly set forth; if it be the doing of an act, which is not an offence at common law, but only by statute, the purpose of the conspiracy must be set forth in such a manner as to show that it is within the terms of the statute.

When a conspiracy is plainly and technically alleged, the acts done in pursuance of it need not be set out; or, if set out, they need not be proved.

It is not a sufficient statement of the offence, in an indictment for a conspiracy to cheat, to allege that the defendants conspired together to cheat and defraud P. S. S. of his goods; or to acquire and get into their possession the goods of P. S. S., under color and pretence of buying the same; or to get possession of the goods of P. S. S. upon trust and credit, and then to remove and transport them out of the commonwealth.

The words "cheat and defraud" do not necessarily import any offence, either by statute, or at common law; and, therefore, an indictment for a conspiracy, in which the object is alleged to be to "cheat and defraud," must set forth in detail such further allegations, as will show the object to be an offence, either by statute, or at common law.

THE defendants, William P. Eastman, Arthur M. Eastman, and Townsend Fondey, were indicted in the municipal court of the city of Boston, at the April term, 1844, on fifteen charges of conspiracy to cheat and defraud as many different individuals and firms named in the indictment. The several charges were set forth in the same manner, each being the subject of three counts, the first, second, and third of which, in each case, were in the same form, substantially, with the corresponding counts in every other. The contents of the indictment will sufficiently appear from a statement of the first three counts, in which the defendants are charged with one of the fifteen alleged conspiracies.

The first count alleged, that the defendants, "being evil disposed persons, and devising and intending one Philo S. Shelton, &c., to injure and defraud, on the twenty-sixth day of March, in the year eighteen hundred and forty-four, at, &c., did unlawfully conspire, combine, confederate, and agree together, the said Shelton to injure, cheat, and defraud of his moneys, goods and chattels, against the peace," &c.

The second count alleged, that the defendants, on, &c., at, &c., " did falsely conspire, combine, confederate, and agree among themselves, unlawfully and fraudulently to acquire and get into their hands and possession the goods, wares, and merchandise of one Philo S. Shelton, &c., under color and pretence of buying the same of and from the said Shelton, and that, in pursuance of, and according to the conspiracy, combination, confederacy, and agreement aforesaid, they the said defendants then and there falsely, unlawfully, and deceitfully did obtain and acquire of the said Shelton, one hundred and ten bags of coffee, being the proper goods and merchandise of him the said Shelton, of the value of thirteen hundred and twenty-eight dollars, under pretence of buying the same, and did then and there, in pursuance of the conspiracy, combination and agreement aforesaid, cheat and defraud him thereof; against the peace," &c.

The third count alleged, that the defendants, "wickedly and unjustly devising and intending one Philo S. Shelton, &c., to defraud and cheat of his goods, property, and merchandise, on, &c., at, &c., did falsely and fraudulently conspire, combine, confederate, and agree together among themselves, to obtain and get into their hands and possession, of and from the said Philo S. Shelton, his goods, property, and merchandise, upon trust and credit, and then to remove, transport and send the same out of the said commonwealth, and defraud him thereof; and that the said defendants, in pursuance of, and according to the conspiracy, combination, confederacy, and agreement aforesaid, so as aforesaid had, did then and there falsely and fraudulently obtain and get into their hands and possession, of and from the said Shelton, one

hundred and ten bags of coffee, of his proper goods, wares, and merchandise, altogether of the value of thirteen hundred and twenty-eight dollars, upon trust and credit; and in further pursuance of the conspiracy, combination, and confederacy aforesaid, so as aforesaid had among themselves, they the said defendants, before the time of payment for the said goods, property, and merchandise had arrived, did then and there make certain preparations, and did then and there attempt, and did then and there do certain overt acts to remove, transport and send the same out of the said commonwealth, and did then and there, in manner aforesaid, cheat and defraud the said Shelton of his goods, property, and merchandise aforesaid; against the peace," &c.

The third count, in some of the charges, varied from the preceding, in alleging that the defendants instead of attempting to remove, &c., did actually remove and transport, the goods mentioned therein out of the commonwealth.

At the succeeding May term, the defendants moved that the indictment be quashed, on the ground, that no offence was set forth therein. This motion was argued before *Allen,* J., by whom the cause was continued for advisement, until the July term, when the opinion of the court was stated by *Ward,* J., disallowing the motion. It being intimated however, at the same time, that the court would accede to any arrangement or disposition of the case, by which the questions of law arising on the indictment might be first argued in this court, the defendants demurred to the indictment; and the demurrer being overruled, the defendants thereupon alleged exceptions to the order of the municipal court overruling the same, and thus brought the case before this court.

At the March term of this court, 1845, upon the cause being opened, the court declined hearing the demurrer argued, unless upon the understanding, that the judgment upon it, if in favor of the commonwealth, should be final. The defendants thereupon withdrew their exceptions, and the case was remanded to the municipal court for further proceedings.

In the municipal court, the defendants renewed their motion to quash the indictment; and the case being continued for a hearing thereon, before the judges of the court of common pleas, at their semiannual meeting in July, the motion was then partially argued, by *R. Choate & G. Bemis*, for the defendants, and by *S. D. Parker*, for the commonwealth; but the judges declining to interfere in the summary manner proposed, (unless the defendants would agree to abide by the decision, if against them, which they declined doing) the motion was refused and the case was directed to be tried, and was accordingly tried, in the municipal court, before *Cushing*, J., at the September term, 1845.*

After the empanelling of the jury, and before the commencement of the trial, the defendants renewed their motion to quash the indictment, and objected to the admission of any evidence in support of it; but the motion and objection were overruled, and the trial proceeded. The defendants were convicted of all the charges in the indictment except one in reference to which no evidence was given; and they thereupon alleged exceptions to the order above mentioned overruling the motion to quash, and to other orders, rulings, and instructions of the judge, before whom the trial took place.

The following outline of the principal facts, as they are stated in the bill of exceptions, will be sufficient to explain

---

* It may be useful to state, for the information of those, who are not conversant with the system of criminal procedure, which is in use in this commonwealth, that the right to take exceptions to the orders, rulings, and instructions of the judge, before whom an indictment is tried, is confined to the defendant, and is denied altogether to the commonwealth. The judges of the court of common pleas, therefore, who are *ex officiis* judges of the municipal court of the city of Boston, and who have original and exclusive jurisdiction of all indictments (except those for capital crimes), consider it to be their duty, in all cases, where the law is doubtful, but important to be settled, to rule against the defendant, in order that the case may be brought to this court, and the law arising therein authoritatively determined. These were in substance the reasons given by the court of common pleas, for refusing fully to hear the parties on the motion for quashing the indictment, in this case, and directing it to be tried in the ordinary manner.

the points of law, presented thereby for the consideration of the court.

The three defendants, at the time of the transactions which were the subjects of the several charges in the indictment, had for two or three months been partners in trade in the city of Boston, under the firm and style of Eastman, Fondey and company. Two of the partners had previously been connected in business with another person, under the firm and style of Eastman, Fondey and Hollister, which partnership had been dissolved, and to the business of which the first named firm had succeeded.

The defendants voluntarily became insolvent on the 29th of March, 1844.

For the three or four weeks preceding their insolvency, they had made somewhat extensive purchases of goods, ostensibly for cash, though really on the short but indefinite term of credit, usually accorded at the pleasure of the sellers on sales for cash, and sometimes extending to a period of several days, or a week, or even longer.

The goods, which were the subjects of many of these purchases, were immediately shipped for New York, Baltimore, and other places. The sellers had never received payment, though the sales were made for cash; but, in some instances, they had obtained possession of the goods sold, by the institution of replevin suits, which were still pending.

Fifteen transactions of this description were the foundation of the present indictment; and the general ground upon which the prosecution rested was, that, from the circumstances attending and shortly preceding these purchases, it was manifest, that they were not made in the fair course of business, but were effected for the purpose of defrauding the sellers of their goods, and in pursuance of a previous conspiracy to cheat and defraud.

The purchases in question appeared to have been made in the usual manner of sales for cash, at fair prices, and unaccompanied by any circumstances calculated to induce suspicion, on the part of the sellers. But, in order to show that

they were effected in pursuance of a conspiracy to cheat, a vast amount of evidence, derived from a great variety of sources, was introduced.

The questions presented by the bill of exceptions, which arose principally upon the admission of evidence at the trial, against the objections of the defendants, are therein set forth as follows:

*First.* Certain letters, in the custody of the defendants' assignee in insolvency and produced by him, purporting to be addressed to the defendants by various correspondents, were offered in evidence, without any previous proof of the genuineness of the handwriting of the supposed writers.

It appeared from the testimony of the messenger in insolvency, that, on the day after the defendants applied for the benefit of the insolvent act, the messenger, accompanied by some of the creditors of the defendants, went to the store occupied by the latter, the key of which had been previously delivered to him by the defendants, and broke open one of their desks, having no key for unlocking it, and took therefrom certain papers which were delivered by him to the assignee; but the witness could not identify any of the papers produced by the assignee, as those which had been taken possession of by him as messenger.

The letters were objected to as incompetent and irrelevant, and also because they were not accompanied by proof of the handwriting of the persons, by whom they purported to be signed. The attorney for the commonwealth contended, that they were admissible as evidence of parts of transactions between the defendants and the persons whose names they purported to bear, and as evidence to be considered in connection with the answers, or other parts of the correspondence, which he said he should subsequently offer, that certain things were stated to the defendants, and done by them. The letters were then admitted and read to the jury.

Subsequently, certain letters, or what purported to be letter press copies of letters, addressed by the defendants to their correspondents, (the same being also produced from the cus-

tody of the assignee) were read by the attorney for the commonwealth, in connection with the letters above mentioned, without objection.

*Second.* A schedule of the assets, furnished by the defendants to their assignees, was put by the attorney for the commonwealth into the hands of a witness called by him, and the witness was then inquired of, whether any of the assets mentioned in the schedule were of any value, and, if so, which of them, and what was their value. This question was objected to, but admitted; and the witness then produced and read in answer a paper, which was also objected to but admitted. The paper purported to be a schedule of the assets of the defendants, both as a partnership and as individuals, with a certificate attached, signed by the witness and another person, stating that they had examined the assets of the defendants, and, as far as they could form an opinion, had annexed a schedule of such amounts as might be considered good and collectible.

*Third.* A witness, called by the attorney for the commonwealth, was asked by him, whether the credit and standing of the defendants were such, that they could have bought goods on credit, at the time they purchased of the witness. This question was objected to, but permitted to be asked.

*Fourth.* Ten witnesses were called by the attorney for the commonwealth, to prove separate and distinct sales by each of them to the defendants, in the month of March, 1844, (at or about the time of the transactions which were the subject of the indictment) of the same description of goods, and under the same circumstances, substantially, as those charged in the indictment. Each of these sales was a separate and distinct transaction. For two of these sales indictments had been found, and were still pending, against one of the defendants. This evidence was objected to, except so far as it went to prove the whole amount of the defendants' purchases at the period in question. But it was admitted as evidence of the intent alleged in the indictment

*Fifth.* Evidence was offered, on the part of the prosecution, to show that the defendants, in some instances, during the month of February, 1844, procured bills of lading to be made out, which they forwarded to their correspondents in New York, accompanied by drafts for the whole or a part of the . amount thereof, a few days before the goods described in such bills of lading were in fact purchased. This evidence was objected to, but admitted.

*Sixth.* The attorney for the commonwealth, after the case had been closed for the prosecution, in order to show the participation of the defendant, Fondey, in the transactions which were the subject of the indictment, proposed to cross examine the defendants' witnesses, for the purpose of proving Fondey's signatures to some of the letters, signed in the name of the firm, which had been read by the attorney in evidence for the prosecution, without the tender of any such proof, although he had proved some specimens of Fondey's handwriting, with a view to a comparison of the same. This evidence was objected to, but admitted.

*Seventh.* The copies of letters, in the letter-book of the defendants, which was produced with the other books and papers by their assignee, appeared (upon inspection merely without other evidence) to be either impressions from the letters themselves, taken at the time they were written by means of a press, or to have been written by the same hand by which, and at the same time when, the originals were written, by means of a machine. And, for the purpose of enabling the jury, by a comparison of hands, to determine whether a particular paper produced was in Fondey's handwriting, the attorney for the commonwealth proposed to ask a witness who had seen Fondey write, whether a letter in the letter-book was in his handwriting. This question was objected to, but admitted.

*Eighth.* When the case had been closed on the part of the prosecution, the defendants' counsel moved the court, that the case of Townsend Fondey should be first put to the jury, with instructions that there was no evidence against

17 *

him, and no evidence to warrant his conviction ; and, generally, that the court should give such a direction to his case, that he might become a witness for the other defendants. This motion was overruled.

The evidence, so far as this defendant was concerned, went to show that he took no part in making the purchases charged as the subjects of the several conspiracies set forth in the indictment ; but that he confined himself to the in-door business of the firm, to keeping their books of account, and to conducting their correspondence. Some of the letters, relating to consignments of goods under the circumstances indicated in the fifth exception, namely, where bills of lading were sent forward before the goods described therein had been purchased, (such letters purporting to be invoices of the goods with directions for their sale) were admitted to be in the handwriting of this defendant. But there was no other proof, that he had any knowledge, at the time of making such invoices, that the goods were not then purchased, than the circumstance of his having written such letters ; nor was he in any way connected by proof with the bills of lading, or with the drafts so drawn and sent forward.

There was no evidence that Fondey had any knowledge of the intentions of his partners, to make purchases of the persons named in the indictment, or of any intention whatsoever of theirs, not to pay for what they should so buy, or of any thing that passed between them and the sellers, at the time of the several purchases.

*Ninth.* The attorney for the commonwealth, in closing the case for the prosecution, did not contend, that the defendants had made any false representations, or practised any artifices or deceptive contrivances, for the purpose of inducing the several sellers to part with their goods, or that the defendants had obtained the goods by means of any such pretences, artifices, or contrivances. But the general ground, on which he placed the case, was, that the defendants continued to purchase after they knew they had become insol-

vent, without disclosing the fact of their insolvency to the sellers, and without any reasonable expectation of being able to pay for the goods in the regular and ordinary course of their business. It was not suggested, that the defendants had withheld any property from their assignees, or that they had made any fraudulent assignments or conveyances.

The defendants contended, that, in order to constitute the offence of conspiracy, there must be a combination or agreement to do something criminal in itself, or unlawful as against positive law, or to use means of accomplishment, against which common prudence could not guard ; that, to make out the offence of a conspiracy to cheat, such as is charged in this indictment, there must be evidence of an unlawful combination or agreement to cheat, by means of some false pretences, which, in themselves, would be the subject of indictment, or by the use of some fraud or deceit, which would affect the public, or by some fraudulent and deceitful means, against which common prudence could not guard; that, in the absence of proof of false pretences, or facts of intentional deception, at the time of the purchases by the defendants, the indictment could not be sustained, unless the jury should be satisfied, that the defendants obtained the goods with an intention not to pay for them ; and that such intention was not inferrible from the mere fact that the defendants were deeply insolvent, at the time when the several purchases were made.

The presiding judge, in his charge to the jury, after a general explanation of the law relative to the offence of conspiracy, stated to them, that, upon the evidence in the case, there were three general inquiries, which it was their duty to make, and upon each of which they must be satisfied affirmatively, in order to a conviction of the defendants, namely : *first*, whether the purchases of goods by the defendants were unlawful acts which might be the subject of a conspiracy ; *second*, whether they were made in pursuance of a previous agreement, confederacy, or combination ; and, *third*, whether they were made with an intent to cheat and defraud. The

jury were then instructed specifically as to each of the inquiries thus designated.

The defendants excepted generally to the entire instructions ; but as certain portions only were controverted in the argument, or considered by the court, those alone are material to be stated.

In reference to the first inquiry, the jury were instructed, " that if they should be of opinion, upon the evidence, that the defendants made any of the purchases of goods mentioned in the indictment, at a time when they had full knowledge of their insolvency, without any reasonable expectation of being able to pay for such goods in and by means of the fair and ordinary course of their business, and without making known their situation to the sellers, every such purchase was a wrongful act, which might be the subject of a conspiracy."

In reference to the third inquiry, the jury were instructed, in general, " to consider every fact and circumstance which had been given in evidence, indicative of actual intention, and tending to throw any light on the question of the intent of the parties ; and that though the conduct of the defendants, if, at the time of effecting the several purchases, they resorted to the use of any artifice, trick, deception, or misrepresentation, with a view to influence the sellers, would be so entirely inconsistent with good faith, as to render it difficult to admit any such hypothesis ; yet, if the purchases in question were not effected or accompanied by any such positive deception as above mentioned, but were only attended by a silent concealment of facts and circumstances, in reference to which no inquiries were made, it would be the duty of the jury to take into consideration, with a view to determine upon the intention, every fact and every circumstance, indicative of an honest intention, or of a reasonable expectation, on the part of the defendants, to pay the debts thus contracted."

It being intimated by the court, that the preliminary question presented by the bill of exceptions, namely, as o the

sufficiency of the indictment, could not regularly be entertained in the form of an exception to the refusal of the municipal court to quash it, but that the question would more
properly arise on a motion in arrest of judgment, the defendants thereupon filed such a motion, averring the insufficiency
of the indictment in general terms.*

*G. Bemis,* for the defendants.

I. *As to the motion in arrest of judgment.*

The second form of count, which is the only one containing any statement of means, alleges that the defendants
conspired to get possession of the goods of the prosecutor,
under " color and pretence of buying the same." But this
allegation does not charge any unlawful act, and, therefore, if
the conspiracy is not otherwise sufficiently set out, the defect
cannot be cured by the averment that it has been carried into
execution. *Comm'th* v. *Hunt,* 4 Met. 111. In the second
and third forms, in which the execution of the conspiracy is
stated, the conspiracy is merged in the completed offence.
*Comm'th* v. *Kingsbury,* 5 Mass. 106 ; *Lambert* v. *The People,* 9 Cow. 578. And these counts are insufficient as charges
of cheating. 3 Chit. C. L. 999 ; *Comm'th* v. *Warren,* 6
Mass. 72; *Lambert* v. *The People,* before cited.

The validity of the indictment must consequently depend
upon the sufficiency of the first form, in which the defendants are charged with a conspiracy to cheat and defraud a
person named therein of his moneys, goods, and chattels. It
is contended, on behalf of the defendants, that this form is
insufficient, because it does not set out any object criminal in
itself, or illegal as being against positive law, or a fraud
affecting the public, against which common prudence could
not guard.

1. This form of indictment is insufficient on the weight of
authority. In this commonwealth, it does not appear, that
the precise form here used has ever been judicially passed

* See *Comm'th* v. *Peck,* 1 Met. 448 ; *State* v. *Burlingame,* 15 Maine, 104 ;
*Rex* v. *Pollman,* 2 Camp. 230.

upon; but the law as settled in *Comm'th* v. *Hunt*, 4 Met. 111, and the reasoning of the court with reference to the third count in that case, go far towards establishing the doctrine contended for. In England, also, the law upon this point is not settled. It is possible, that the form in question might be considered as sufficient in the queen's bench, under the recent decision of *The Queen* v. *Kenrick*, 5 Ad. & El. (N. S.) 49; though the law of that case, except as to the form of the indictment, is decisive of the present for the defendants. The case of *The Queen* v. *Kenrick* may perhaps be considered as affirming that of *The King* v. *Gill*, 2 Barn. & Ald. 204; but both these cases are distinguishable from the present, inasmuch as they contained a charge of conspiracy to cheat by false pretences, *eo nomine.* See *Comm'th* v. *Hunt*, 4 Met. 126. It may well be doubted, however, whether the case of *The Queen* v. *Kenrick* will ultimately be sustained. The more recent decision of *The Queen* v. *King*, 7 Ad. & El. (N. S.) 782, in the exchequer chamber, throws a shade over it ; and prior to the case of *The Queen* v. *Kenrick*, the current of authorities was the other way. *The King* v. *Biers*, 1 Ad. & El. 327; *The Queen* v. *Peck*, 9 Ad. & El. 686 ; *Rex* v. *Fowle*, 4 Car. & P. 592 ; *Rex* v. *Richardson*, 1 M. & Rob. 402 ; *The King* v. *Turner*, 13 East, 228; *Rex* v. *Pywell*, 1 Stark. R. 402 ; *The Queen* v. *Parker*, 3 Ad. & El. (N. S.) 292, and Mr. Greaves's note thereon, in 2 Russ. on C. 695, note (n); 2 Russ. on C. (5 Am. ed.) 690; 1 Stark. C. P. (1st ed.) 144, 145, 147.

In other states, the weight of authority is against the sufficiency of the indictment. The cases of *Lambert* v. *The People*, 9 Cow. 578, in New York, *State* v. *Rickey*, 4 Hals. 293, in New Jersey, and *Hartmann* v. *Comm'th*, 5 Barr, 60, in Pennsylvania, all leading cases, and the last mentioned a very recent one, are strong authorities for the defendants on this point. In New York, the case of *Lambert* v. *The People* was followed by a statute, establishing the principle now contended for ; and similar legislation has also taken place

in Alabama, Missouri, and Arkansas. In the case of *State* v. *Buchanan*, 5 Har. & John. 317, a leading case in Maryland, which may be cited for the prosecution, as to the law of conspiracy, rather than for the form of the indictment, the indictment either sets out the means, by which the conspiracy was to be effected, or alleges the offence of embezzlement as its object.

2. This form of indictment does not set out the offence charged with sufficient certainty and precision, and is therefore defective on principle. The whole charge is contained in the words " conspire to cheat and defraud one P. S. S. of his goods." If so brief a statement of an offence be sufficient, it must be in consequence of the technical and well settled import of the terms used.

The word *conspire* is not technical, like the word *murdered* or *ravished*, but signifies nothing more than that the defendants *together* did or *agreed to do* the act imputed to them. 1 Deac. C. L. 279; 3 Chit. C. L. 1143.

The use of the word *defrauding*, in actions of trover and bills in equity, shows that its signification is not exclusively criminal. See *Adams* v. *Paige*, 7 Pick. 542. In many cases, it is only equivalent to *depriving*. See *State* v. *Rickey*, 4 Hals. 293 ; *Rex* v. *Richardson*, 1 M. & Rob. 402 ; *The Queen* v. *Peck*, 9 Ad. & El. 686. In *Comm'th* v. *Hunt*, 4 Met. 111, the indictment might as properly have charged the defendants with conspiring to *defraud* the prosecutor of his profits, as to *diminish* them.

Nor has the word *cheat* any definitely settled signification. In the law of slander, next to the criminal law, the sense of words is most carefully canvassed. 1 Stark. on S. (Wend. ed.) 69. But it is not actionable to accuse one of *cheating*. *Savile* v. *Jardine*, 2 H. Black. 531; *Stevenson* v. *Hayden*, 2 Mass. 506 ; *Chase* v. *Whitlock*, 3 Hill, 139.

So, in the criminal law, there are many *cheats* which are not punishable, but only the groundwork of a civil liability. 1 Russ. on C. (5th Am. ed.) 280, 282, 285; *Comm'th* v. *Hearsey*, 1 Mass. 137 ; *Comm'th* v. *Call*, 21 Pick. 515, 520;

*Comm'th* v. *Warren*, 6 Mass. 72; *Comm'th* v. *Drew*, 19 Pick. 179, 185; *Comm'th* v. *Manley*, 12 Pick. 173; *Adams* v. *Paige*, 7 Pick. 542; *Richards* v. *Farnham*, 13 Pick. 451.

It being thus manifest, that to cheat and defraud one of his property does not necessarily import a criminal offence; — are those terms adequate to describe an offence " fully and plainly, substantially and formally," as required by the bill of rights? This provision is held not to change the rules of the common law. *Comm'th* v. *Davis*, 11 Pick. 432; *Comm'th* v. *Phillips*, 16 Pick. 211. But it is a most important declaration of the qualities, which the common law requires in an indictment. See *Rex* v. *Horne*, Cowp. 672, 682.

When, then, an indictment charges a conspiracy to cheat the prosecutor of his goods, what are the defendants to understand is the nature of the accusation against them? It may import, that they undertook to cheat, by agreeing to buy without intending to pay any part of the price; or by agreeing to buy, and then to become insolvent, and pay merely a dividend; or by agreeing to get possession of the goods, and then maliciously to destroy them; or by agreeing to get possession of them for some lawful purpose, as, for instance, as common carriers, and then to refuse to redeliver them. Which, of all these and a variety of other supposable charges, are the defendants to be prepared to meet? Which, of all the varied forms of cheating, from merely diminishing one's profits up to the most culpable knavery, can they be reasonably sure is the accusation intended by the indictment? If, instead of an indictment, the charge were made the subject of a civil action, would not much greater particularity be required? It is true, that the action for a conspiracy supposes an actual loss or injury to have taken place; but would a declaration be sufficient, which merely set forth the agreement to injure, and the actual injury, without stating the manner in which the injury was to be and was in fact effected?

If it be said, that the criminal offence of conspiracy con-

sists in the agreement, then, the agreement must be known to the prosecutor; and, if known, why should it not be set out with the same particularity as in a civil action? If what was agreed to be done has been done, as in the present case, there can be no pretence of an inability to set out the agreement fully. See Mr. Greaves's remarks in note (n) 2 Russ. on C. 694, and *The King* v. *Nield*, 6 East, 417.

There are cases, in which, if a part only of the agreement be set out, a presumption of a criminal conspiracy will arise; but, if the whole be stated, such presumption will be removed. The cases, before cited, of *The Queen* v. *Peck*, *Rex* v. *Richardson*, and *Comm'th* v. *Manley*, are of this description. Thus, in the case of *Rex* v. *Richardson*, in which the charge was of a conspiracy to defraud the prosecutor " of the fruits of a verdict," it was held, that the latter words did away the presumption of crime, which might otherwise have arisen from the general statement of a conspiracy to defraud. In such cases, is it not a *suppressio veri*, on the part of the prosecutor, (who, of course, knows the whole agreement, and that if set out it would constitute no offence), to state only so much of it as will raise a presumption of crime? If, in the present case, the conspiracy were to cheat and defraud P. S. S., by getting possession of his goods, " without paying for them," ought not the indictment, in fairness, to have contained the latter words, which would have shown that no offence had been committed? It cannot be the theory of the law, nor is it consistent with the bill of rights, thus to expose a citizen to trial, as for a crime, on a charge, which, if fully stated, would not constitute an offence.

Admitting the offence to consist in the *intent*, or rather in the *agreement*, to do an unlawful act, there is no offence, to which, on principle, the constitutional provision above mentioned should be more strictly applied; for this, it is believed, is the only offence known in our law, which does not require for its consummation, the doing of some overt act. Even in the case of attempts made punishable by our statute (Rev. Sts.

*c.* 133, § 12,) as well as attempts at common law (*Reg.* v. *Meredith*, 8 Carr. & P. 589,) there must be some act done *towards* the commission of the offence attempted.

On these grounds, it is contended, that this form of indictment, — so far as an indictment ought to inform the defendants therein of the nature of the charge against them, — is defective, and ought not to be sustained ; but, if the form be correct, the facts do not show that the offence of conspiracy has been committed ; inasmuch, as false pretences, or some other technical offence of cheating, must be proved, even if not necessary to be averred. *The Queen* v. *Kenrick*, 5 Ad. & El. (N. S.) 49 ; *Rex* v. *Hamilton*, 7 Carr. & P. 448.

II. *As to the exceptions.*

1. The letters which were read in evidence, purporting to be addressed to the defendants by their correspondents, were improperly admitted for two reasons : first, they were not identified by the messenger as among the papers of the defendants of which he obtained possession, nor were they otherwise connected with the defendants (*Comm'th* v. *Kinison*, 4 Mass. 646) ; and, second, if they had been properly identified, they were not admissible as evidence of the facts stated in them. *Rex* v. *Plumer*, Russ. & Ry. 264. The ground, upon which the letters of correspondents, addressed to a party and found in his possession, are admitted as evidence against him, is an implied admission of, or acquiescence in, the statements they contain ; but the mere possession of unanswered letters is not, of itself, such an acquiescence or admission. See *Fairlie* v. *Denton*, 3 Carr. & P. 103 ; Phillips on Ev. (4th Am. ed.) Cow. & H. notes, 156, 195 ; 1 Greenl. on Ev. § 198. Nor did they become admissible by the subsequent reading of the letters of the defendants to their correspondents ; the latter not being shown to be in reply to the former, and the statements of the former not being recognized in the latter. *M'Cully* v. *Barr*, 17 S. & R. 445.

2. The evidence as to the value of the defendants' assets was incompetent, first, because it was not the best evidence,

being the mere opinion of the witness, where positive knowledge might have been obtained either from the debtors of the estate or the assignees themselves; and, secondly, because the other party to the instrument was not called or sworn. *Rider* v. *Ocean Ins. Co.* 20 Pick. 259, 262; *Webber* v. *Eastern R. R. Co.* 2 Met. 147, 149, 150.

3. The inquiry, as to the defendants' credit and standing, was objectionable, not only as asking the opinion of the witness himself, but the opinions of others not under oath.

4. The fourth exception relates to the evidence of intent inferrible from the doing of other similar acts, or the existence of other similar transactions, contemporaneously with the acts or transactions complained of as offences. This is objectionable, in the way in which it was put to the jury, because it authorized them to infer, from the fifteen purchases collectively, what they probably could not infer in each separate instance; namely, an intent to defraud another prosecutor than the one named in the count under consideration. *Comm'th* v. *Harley,* 7 Met. 506.

5. The evidence objected to under this head, which referred to proceedings more than a month previous to the transactions complained of, was too long prior in point of time to have any bearing upon the case.

6. The sixth exception presents the question, whether a party, having closed his case, shall be permitted to supply deficiencies in his own proof, by cross examining the witnesses on the other side.

7. In order to prove the handwriting of a paper, by a comparison of it with other writings, the latter must be genuine originals; and, for this purpose, copies produced by a press, or by a machine, however exact they may be, cannot be regarded as originals. *Nodin* v. *Murray,* 3 Camp. 228. See also *Moody* v. *Rowell,* 17 Pick. 490, 495; 1 Phillips Ev. 446; 1 Greenl. Ev. § 581; Phillips on Ev. (4th Am. ed.) Cow. & H. notes, 1202.

8. The eighth exception was taken to the refusal of the municipal court to put the case of Townsend Fondey to the

jury, upon the evidence for the prosecution. This was the right of the defendants, and not merely discretionary with the court, if, as is contended, there was no evidence against Fondey.

9. The general question, arising on the last exception, is, whether it is unlawful for an insolvent person, knowing the state of his affairs, to continue his business afterwards so far as to make purchases of goods on credit. It is contended, first, that there is nothing in the insolvent law, which makes such continuance in business criminal, or even wrongful; and, second, that it is not unlawful, much less criminal, to contract debts, without a reasonable expectation of being able to pay them, in the fair and ordinary course of business. *Jones* v. *Howland,* 8 Met. 377.

*S. D. Parker,* for the commonwealth.

I. *As to the exceptions.*

1. The letters of the defendants, being found by the messenger among their papers, and taken possession of by him, according to the provisions of the first and sixth sections of the insolvent act, as papers relating to their estate, came from the proper custody, and must be presumed to be genuine and authentic, in the absence of proof to the contrary ; and they were proper evidence, to the extent and in the manner they were used, as stated in the bill of exceptions. *New England Mar. Ins. Co.* v. *D'Wolf,* 8 Pick. 56, 62 ; *The United States,* v. *Libby,* 1 Woodbury & Minot, 221, 225, 226.

2. The witness, called to testify to the value of the assets, stood in the position of an expert ; and the subject, as to which he was interrogated, must, from the very nature of the case, be a matter of opinion. An appraisement is necessarily nothing but an opinion. The paper, produced by the witness, was not put in as evidence, but simply read by him as his opinion in answer to the inquiry relative to the value of the assets. If admissible as the opinion of the witness, does it become inadmissible when the witness adds, that it is also the opinion of his associate ?

3. The credit and standing of the defendants were not

mere matters of opinion, but facts within the knowledge of witnesses ; and, if the defendants' standing were such that they could not have obtained goods on credit, this was a fact manifestly important and material to be shown, in reference to the character of the transactions in question. The inquiry objected to was therefore proper.

4. The authorities are abundant to show, that evidence of other acts and transactions, similar to those which are the subjects of investigation, is admissible in proof of intent or guilty knowledge. *Carey* v. *Hotailing*, 1 Hill, 311, 316, 317 ; *Hitchcock's case*, 6 City Hall Recorder, 43 ; *Gardner* v. *Preston*, 2 Day, 205 ; *The King* v. *Parsons*, 1 Wm. Black. (2d ed.) 392, note (*o*); *Rex* v. *Roberts*, 1 Camp. 399.

5. The evidence objected to under this head of the exceptions was clearly admissible to show the intent. *The King* v. *Ellis*, 6 Barn. & Cres. 145 ; *Reg.* v. *Mansfield*, Carr. & Marsh. 140 ; *Rex* v. *Davis*, 6 Carr. & P. 177 ; *The King* v. *Dunn*, Moody, 146 ; and cases cited as to the 4th exception. .

6. The proceeding, which was the ground of the sixth exception, is every day's practice. *Rex* v. *Kroehl*, 2 Stark. R. 343.

7. The letters introduced for the purpose of comparison were not copies, but originals. *Simpson* v. *Thornton*, 2 Mood. & R. 433. When a writing is made on stone, and impressions are taken therefrom, in the process of lithography, every such impression is an original. If this objection is well founded, it applies only to the case of Fondey.

8. The motion, that Fondey's case should be separately put to the jury, on the ground, that there was no evidence affecting him, was a matter strictly within the discretion of the municipal court, and cannot therefore be made the subject of an exception.

9. [This exception was considered by the attorney for the commonwealth in connection with the motion in arrest of judgment.]

18 *

Commonwealth *v.* Eastman and others.

II. *As to the motion in arrest of judgment.*

The three forms, adopted in this indictment, were taker from Davis's Precedents ; the first count being a literal copy of No. 134; the second of No. 124; and the third of No 127, with this difference, that the precedent in Davis alleges that the defendants absconded, instead of alleging that they removed, or made preparations to remove, the goods out of the commonwealth.

The doctrine of merger, insisted upon by the defendants, is not applicable. A misdemeanor may merge in a felony, but not in a misdemeanor. *The People* v. *Mather*, 4 Wend. 229, 265 ; *State* v. *Murray*, 15 Maine, 100. In *Comm'th* v. *Kingsbury*, 5 Mass. 106, cited for the defendants, the acts, which were the subject of the alleged conspiracy, when executed, became a felony. It was also held in that case, that a conspiracy to commit a misdemeanor, and the committing of the same, might be joined in one indictment. In the present case, both the offence charged, and the subject of it, are merely misdemeanors.

As to the certainty required in indictments for conspiracy, it is laid down by Savage, C. J., in *Lambert* v. *The People*, 9 Cow. 581, " that the same certainty is not required as in other cases ; " for which he refers to *Rex* v. *Rispal*, 3 Burr, 1320.

It was argued, that, in order to constitute the offence of conspiracy, the purpose or object must be something criminal in itself. But this is not the rule. There are many cases, in which it would be an indictable conspiracy for two or more to agree to do an act, which one person might execute with impunity. *The King* v. *Kimberly*, 1 Levinz, 62 ; *The King* v. *Armstrong*, 1 Ventris, 304 ; *Rex* v. *Spragg*, 2 Burr, 993 ; *Collins* v. *Comm'th*, 3 S. & R. 220, the second count ; *Comm'th* v. *Hunt*, 4 Met. 111. The true rule, to be drawn from all the cases, seems rather to be, that whatever is wrongfully injurious to the public, or to an individual, may be the subject of a conspiracy, whether it be criminally punishable or not. Rep. on the Pen. Code of Mass. Conspir-

acy, 6, n. (*i*). A good illustration occurs in the case of *Anderson* v. *Comm'th*, 5 Randolph, 627, in which it was held, that a conspiracy to seduce a woman would be indictable, although seduction itself would not be.

The principal alluded to furnishes an answer also to the ninth head of the exceptions; for, though it may not be criminally punishable in an insolvent debtor, to make purchases of goods in the manner supposed by the instruction, to which exception was taken; yet it is impossible to deny, that such purchases would be wrongfully injurious to the sellers.

The general question on this motion is, whether all the counts in the indictment are so defective, as to require that judgment should be arrested; for, if any one of them is good, that may be the foundation of a valid judgment. The law of conspiracy was fully considered, in England, by lord Denman, in the recent case of *The King* v. *Seward*, 1 Ad. & Ell. 706, and in this commonwealth, by the present chief justice of this court, in *Comm'th* v. *Hunt*, 4 Met. 111. According to lord Denman, a conspiracy must be either for an unlawful purpose, or to effect a lawful purpose by unlawful means. The general rule, stated in the last named case, is, that in an indictment for a conspiracy to compass or promote a criminal or unlawful purpose, such purpose must be set forth fully and clearly, and the means, by which it is proposed to be accomplished, need not be stated; but, that in an indictment for a conspiracy to promote or compass a purpose not in itself criminal or unlawful, by the use of criminal or unlawful means, the means intended to be used must be set forth. Tried by the rule thus stated, all the counts in the indictment will be found sufficient, both in form and substance.

1. In the first and other corresponding counts, which allege that the defendants, with intent to injure and defraud one P. S. S., conspired together to cheat and defraud him of his goods, &c., an unlawful purpose is set out. This is indicated by the use of the words *cheat and defraud. Earl of Bristol*

v. *Wilsmore,* 1 Barn. & C. 514, 521; *Rex* v. *Jackson,* 3 Camp. 370; *Scholtz's case,* 5 City Hall Recorder, 112, 114. The words *injure and defraud,* which are used to describe the intent, have a definite technical meaning, and are therefore proper to be used in an indictment, to denote the wrongful and injurious character of the acts to which they are applied. See Rev. Sts. *c.* 126, §§ 1 to 6 & 14; *c.* 127, § 32. These terms sufficiently indicating the unlawfulness of the purpose, it was not necessary to set out the means intended to be used.

This form of indictment received the sanction of this court in *Comm'th* v. *Ward,* 1 Mass. 473, which is the more in point, because the means therein stated, namely, false pretences, were not then criminal, and consequently, no criminal means were there set out. It is also supported by the following English cases and authorities : *The King* v. *Gill,* 2 Barn. & A. 204; *The Queen* v. *Parker,* 3 Ad. & Ell. (N. S.) 292, 298; *The King* v. *Parsons,* 1 Wm. Black. (2d ed.) 392; *The Queen* v. *Kenrick,* 5 Ad. & Ell. (N. S.) 49, 60; *The Queen* v. *King,* 7 Ad. & Ell. (N. S.) 782, 792; *The King* v. *Robinson,* 1 Leach, 44; *The King* v. *Airey,* 2 East, 30; 3 Chitty C. L. (4th Am. ed.) 1143 (referring to Ld. R. 1167, & 1 Salk. 174); Archbold C. P. 675; *The Queen* v. *Best,* 6 Mod. 185; 4 Steph. Comm. 266. The following American cases are to the same effect: *State* v. *Buchanan,* 5 Har. & J. 517; senator Stebbins's argument in *Lambert* v. *The People,* 9 Cow. 578; *Comm'th* v. *Collins,* 3 Serg. & R. 220, the third count; *The People* v. *Olcott,* 2 Johns. Cases, 301, & 2 Day's Cases, 507, note; *Barthelemy* v. *The People,* 2 Hill, 248; *Eason* v. *Petway,* 1 Dev. & Batt. 44, 47; *The People* v. *Mather,* 4 Wend. 264; *Scholtz's case,* 5 City Hall Recorder, 112, 114.

In the case of *State* v. *Rickey,* 4 Hals. 293, cited for the defendants, in which it was held, that it was not indictable to conspire to do an act not criminal, there was no allegation of a purpose to defraud. Of that case, the commissioners for revising the criminal law in this commonwealth remark, that

"it seems to clash with the common law, and the genera' current of jurisprudence, from the case of *The King* v. *Journeymen Tailors*, 8 Mod. 10, downward." Report, Conspiracy, 2, note (*d*). The commissioners also question the correctness of lord Ellenborough's decisions in *The King* v. *Turner*, 13 East, 228, and *Rex* v. *Pywell*, 1 Stark. R. 402. See also, with reference to the authority of those cases, *Lambert* v. *The People*, 9 Cow. 584; Roscoe C. E. 372; *Comm'th* v. *Hunt*, 4 Met. 131; and *The Queen* v. *Kenrick*, 5 Ad. & Ell. (N. S.) 49.

It is said, that to cheat and defraud is not indictable, except under certain special circumstances; and, therefore, that the object of the conspiracy does not appear to be the doing of an unlawful act. The answer is, that the manner of the cheating proposed to be effected is not the test, by which to determine whether it may or may not be the subject of a conspiracy; if wrongfully injurious, it is equally criminal, as if it were indictable.

2. The second and similar counts set out both an unlawful purpose, namely, to cheat and defraud, and the unlawful means, by which it was to be effected, that is to say, the getting possession of the goods of the persons therein named, under color and pretence of buying them, or, in other words, by means of a pretended or void sale. A sale for cash is void, even though the goods are delivered, if the terms of sale are not complied with. *Leven* v. *Smith*, 1 Denio, 571.

3. The third and fourth varieties are but slightly different from the precedent, No. 127, in Davis's Precedents. In the latter, the conspirators are charged with agreeing to abscond out of the commonwealth, after getting the goods into their possession. In the present case, the charge is of a purpose to remove the goods out of the commonwealth. Both are injurious and wrongful acts, which may be the subject of a conspiracy; and these counts charge both an unlawful object, and an agreement to effect it by unlawful means.

A remark, equally applicable to all the counts, is, that this is not an indictment for cheating, or subject to the technical

rules applicable to indictments for cheating, but only for a conspiracy to cheat, to which a very different set of rules is to be applied. The counts may all be bad as an indictment for cheating, but perfectly good as an indictment for a conspiracy to cheat.

*R. Choate* replied.

DEWEY, J.* An exception was taken to the refusal of the municipal court to sustain a motion to quash the indictment, in this case, on the ground, that it sets forth no sufficient charge of any criminal offence. The substantial objections, which were intended to be raised by this exception, come more properly before us upon the motion in arrest of judgment, which was filed in this court at the hearing, and will therefore be considered under that branch of the case. In answer, however, to the exception to the decision of the municipal court upon this point, it is sufficient to say, that a motion to quash is addressed to the sound discretion of the court, in which an indictment is pending, and if refused, is not a proper subject of exception. Such a motion should not be allowed to prevail in a doubtful case, but only when the insufficiency of an indictment is so palpable, as clearly to satisfy the presiding judge, that a verdict thereon would not authorize a judgment against the defendant.

Waiving the further consideration, at present, of the sufficiency of the indictment, I will proceed to notice the various exceptions to the admission of evidence, and to the instructions of the presiding judge, as to the facts necessary to be established, in order to authorize a verdict against the defendants.

I. The first exception relates to the admission of certain letters, purporting to be addressed to the defendants by certain of their correspondents, without any proof being offered of the genuineness of the handwriting of those correspondents. It is left somewhat uncertain, as to the extent of the evidence on the part of the commonwealth, to show that

---

* *Metcalf*, J., did not sit in this case.

these letters came from the possession of the defendants. If it be true, as seems to be stated in the bill of exceptions, that the only evidence upon this point was that of the messenger, " who could not identify any of the papers produced by the assignee as those which he had taken possession of as mes· senger," then clearly there was an important link wanting to complete the chain of evidence. The testimony of the assignee was requisite to establish the fact, that these letters came from the possession of the defendants. It should have been shown, by the testimony of the assignee, that the letters and papers offered in evidence were received by him from the messenger; and his testimony to such fact, together with that of the messenger, that all the papers delivered by him to the assignee were obtained from the possession of the defendants, might well authorize the jury to find, that the papers and letters produced came from the custody of the defendants; although the messenger might not be able to identify the particular papers thus offered in evidence.

The letters, however, if properly identified, would not of themselves authorize any inference against the defendants; they were only the acts and declarations of others; and, unless adopted or sanctioned by the defendants, by some reply or statement, or by some act done in pursuance of their suggestions, they ought not to prejudice the defendants. Letters addressed to an individual, and received by him, are not to have the same effect as verbal communications. Silence, in the latter case, may authorize the inference of an assent to the statement made, but not equally so in the case of a letter received but never answered, or acted upon. So far as these letters might have been shown by other proof to have been acted upon or sanctioned by the defendants, so far they would have been competent evidence.

II. The second exception relates to the admission of a certain paper, containing an estimate or appraisal of the assets of the defendants made by two persons; one of whom was called as a witness to show the value of the assets, and was allowed to read to the jury a schedule of the same, on a val-

uation thereof, made and signed by himself and his associate. This paper was an estimate made by both the persons who acted as appraisers, by him who was not called, as well as by the witness. It was thus a valuation made by the former not under oath, and should not have been admitted and read to the jury, without first calling him to testify as to its accuracy.

III. The third exception relates to an inquiry put by the attorney for the commonwealth to a witness, called by him, as to whether the standing and credit of the defendants were such, that they could have bought goods on a credit. This question was objected to, but was permitted by the court. We think the ruling was correct, and the evidence admissible.

IV. Evidence of other purchases of goods than those charged in the indictment, made by the defendants from other persons during the month of March, 1844, under similar circumstances with the transactions charged in the indictment, was admissible for the purpose of showing the nature of the business of the defendants, and the extent of the purchases made by them, and also as bearing upon the *bona fide* character of the dealings of the defendants with the particular individuals alleged to be defrauded.

This species of evidence would not be admissible for the purpose of showing that the defendants had also committed other like offences ; but simply as an indication of their intention in making the purchases set out in the indictment. It is analogous to the proof of the *scienter* in indictments for passing counterfeit money, by showing that the defendant passed other counterfeit money to other persons about the same time. Such evidence is always open to the objection, that it requires the defendant to explain other transactions than those charged in the indictment ; but, when offered for the limited purpose above stated, — that of showing a criminal intent in the doing of the act charged in the indictment, — it has always been held admissible. In *Rex* v. *Roberts,* 1 Camp. 399, such evidence was admitted as competent.

V. The evidence offered for the prosecution, tending to show that the defendants, during the month of February,

1844, in several instances, obtained bills of lading and forwarded them to their correspondents in New York and elsewhere, accompanied by drafts thereon, before the goods described in such bills of lading were actually purchased, was admissible for the reason given under the head of the fourth exception, namely, as having a bearing upon the question of the defendants' intention, in the transactions set forth in the indictment.

VI. We perceive no objection to the ruling of the court, permitting the attorney for the commonwealth, after closing the case for the prosecution, so far as the introduction of witnesses by him was proposed, to cross examine witnesses introduced by the defendants, for the purpose of proving more fully the signatures to certain papers, which had been before, as was contended, insufficiently proved. The introduction of testimony, even out of the usual order of time, must, to some extent, be discretionary with the presiding judge ; and therefore, a departure from the ordinary practice, (which, however, we do not perceive in the present case,) would not furnish a ground for exception.

VII. The copies of letters, in the letter book of the defendants, were not admissible as competent standards of comparison, by which to prove the genuineness of signatures to papers produced on the part of the prosecution. Impressions of writings produced by means of a press, or duplicate copies made by a machine, are not admissible for this purpose. Nothing but original signatures can be used as standards of comparison, by which to prove other signatures to be genuine. Nor can a paper, proposed to be used as a standard, be proved to be an original, and a genuine signature, merely by the opinion of a witness that it is so ; such opinion being derived solely from his general knowledge of the handwriting of the person whose signature it purported to be. The evidence, resulting from a comparison of a disputed signature with other proved signatures, is not regarded as evidence of the most satisfactory character, and by some most respectable judicial tribunals is entirely rejected. In

this commonwealth it is competent evidence; but the handwriting used as a standard must first be established by clear and undoubted proof, that is, either by direct evidence of the signature, or by some equivalent evidence. *Moody* v. *Rowell,* 17 Pick. 490; *Richardson* v. *Newcomb,* 21 Pick. 315, 317.

VIII. The request of the defendants' counsel, that the case of Townsend Fondey should be first put to the jury, with instructions "that there was no evidence against him, and no evidence to warrant his conviction," with a view to obtain his acquittal, at such a stage in the trial of the indictment, that he might be used as a witness for the other defendants, was, in our opinion, properly refused. The submitting of the distinct case of one of several defendants to the jury, during the progress of a trial, is a discretionary power vested in the presiding judge, peculiarly within his province, and to be exercised only upon his views of the evidence. If there is any evidence against such defendant, there is no legal right in the other defendants to insist upon a finding separately as to him, with a view of using him, if acquitted, as a witness for them; although the presiding judge may strongly incline to the opinion, that the weight of evidence is altogether in his favor. In the present case, there was evidence bearing upon Townsend Fondey, and tending to connect him with the transactions of the other defendants, which well authorized the presiding judge to refuse the motion to put his case to the jury separately.

IX. The next exception, being of a much more general character, and directly affecting the question, as to what acts may be the subject of the criminal offence of conspiracy, necessarily requires a careful consideration of the great principle, upon which this and similar cases are to be tried.

It was not contended by the prosecuting officer, " that the defendants had made any false representations, or practised any artifices or deceptive contrivances, for the purpose of inducing the several sellers to part with their goods, or that they obtained the goods by means of any such pretences, artifices, or contrivances." The general ground taken for the

prosecution was, that the alleged fraud and cheating of the individuals named in the indictment, were sufficiently established by showing, " that the defendants continued to purchase goods, after they knew they had become insolvent, without disclosing the fact of their insolvency to the sellers, and without having any reasonable expectations of being able to pay for the goods so purchased, in the regular and ordinary course of their business."

The counsel for the defendants, on the other hand, contended, that in the absence of all proof of false pretences, or of any artifices, or deceptive contrivances, the indictment could not be sustained, unless the jury should be satisfied, that the defendants obtained the goods, with an intention not to pay for them, which intention was not inferrible from the mere fact of their being deeply insolvent at the time they made the purchases.

The jury were instructed, " that if they should be of opinion, upon the evidence, that the defendants made any of the purchases of goods alluded to in the indictment, at a time when they had full knowledge of their insolvency, without any reasonable expectation of being able to pay for those goods, in and by means of the fair and ordinary course of their business, and without making known their situation to the sellers, every such purchase was a wrongful act, which might be the subject of a conspiracy."

The obtaining of goods on credit, by an insolvent person, without disclosing his insolvency, and without having any reasonable expectation of being able to pay for such goods, in the ordinary course of business, was held to be an unlawful or wrongful act, without proof of any false pretences, or any acts of intentional deception, on the part of the purchasers.

We apprehend, that this instruction was too stringent upon the character of such purchases. The provisions of the insolvent laws, in reference to a debtor, who, knowing himself to be insolvent, makes payment in money, or gives preferences by way of conveyances of his property, to particular

creditors, do not make the acts thus prohibited crimes, or declare them to be unlawful, except as frauds upon the insolvent law itself; nor do they prescribe any other consequences of such acts, than a forfeiture of the right of the party, to a discharge as an insolvent debtor. But if acts of the description stated are unlawful, as frauds upon the insolvent law, yet purchases made, and credits obtained, by one who knows himself to be insolvent, are not within the prohibition. The duty of an insolvent person, to abstain from making purchases on credit from those who are willing to give him credit, is no statute requisition ; nor is it any where enjoined by the insolvent laws. It is at most only a moral obligation. Taking the strongest ground applicable to cases of this nature, the true doctrine cannot go further than this, that such purchases become unlawful, when they are made on a credit asked by the buyer, without any expectation of ability to make the stipulated payment.

Mere inability to pay one's previous debts, — mere mercantile obligation not to continue to trade after one becomes insolvent, — the provision of the statute, that payments made by a party knowing himself to be insolvent, shall debar him from obtaining his discharge, — the further provision, that if such payment is made to a creditor having like knowledge of the insolvency, it shall be invalid, and may be recovered back by the assignee for the benefit of all the creditors ; — all these considerations fail to furnish any authority for the doctrine, that a purchase on credit, made by an insolvent person under the circumstances previously stated, is an unlawful act, which, if accomplished in pursuance of a concert or combination between two or more persons, without the use of any unlawful means, would sustain an indictment for a conspiracy to cheat and defraud the seller.

The presiding judge, at the trial, repudiated the idea, that it is the duty of a person engaged in trade, to resort at once to proceedings under the insolvent laws, and to place his affairs in the hands of assignees, upon ascertaining that he is indebted to a larger amount than can be realized from his

assets. But, at the same time, he held that the purchase of goods on credit by an insolvent person, after knowledge of his insolvency, and without disclosing that fact to the seller, — such buyer having no reasonable expectation of being able to pay for the goods, in the regular and ordinary course of his business, — was an unlawful act.*

The test here assumed is that of "reasonable expectation" of being able to pay for the goods purchased. This is too severe a test. It would be hardly safe to take as the standard of the criminality or lawfulness of a commercial adventure, after it had proved unsuccessful, the result to which sober and discreet minds would have come, as to " the reasonable expectation" that could have been entertained, of a more favorable issue to the adventure. Men of a sanguine temperament, easily deluded by new and visionary schemes of commercial speculation, and influenced thereby to avail themselves of that credit, which the sellers of goods are so lavish and improvident in extending, if, on failing to pay for purchases thus made, they should be strictly tried by this rule, would be found to have been engaged in unlawful acts, and to have been guilty of a violation of duty to their creditors.

The more proper rule would seem to be, that the purchase of goods by an insolvent person, knowing himself to be such, without any expectation of paying for the goods, would be an unlawful act, which might be the subject of a conspiracy. The unlawfulness of the act consists in purchasing the goods of another, and appropriating them to the purchaser's own use, without expecting to pay for them. Nothing less than this will suffice, if the goods are purchased on a credit, and with no false pretences or deceptive contrivances.

A very different case would have been presented, if the defendants had been charged with fraudulently obtaining possession of the goods, under pretence of paying cash for

---

* The introductory remarks of the judge of the municipal court, to which allusion is here made, were not deemed necessary to be reported, in order to an understanding of the case.

19.*

them, upon the delivery; they knowing that they had no funds to pay with, and appropriating the goods to their own use, in fraud of the sellers. Such a case would show a deceptive contrivance or false pretence. The known inability to pay for the goods would render the act of the party a fraudulent and unlawful one. But when the sale and delivery are on a credit given to the party, although a short one, as for three or five days, the mere want of funds and known inability of the buyer to pay, at the time of the purchase, cannot have the like effect, as in the case of a purchase of goods upon a representation that the buyer will pay cash for them on delivery. In the former case, the buyer may honestly and confidently expect to receive funds, in due season, to meet his engagements; but not so in the latter.

The court are of opinion, that the instructions to the jury, upon this point, were erroneous; and, that for this and the other causes already suggested, the verdict must be set aside, and a new trial granted.

The defendants have also filed a motion in arrest of judgment, which presents the general question, whether this indictment would be sufficient to authorize a judgment against the defendants, if the verdict were allowed to stand. As the case has been long pending, and was fully argued upon this point, the court have also considered this question.

The indictment contains forty-five counts, charging in various forms fifteen distinct offences. The first count, which is a form of the indictment used as to every distinct case, and which was considered as the count that ought to be sustained, if either was good, has been the subject of our particular consideration. This count contains a general charge of conspiring to cheat and defraud an individual of his goods, without alleging any actual cheating, or the use of any false pretences to effect the cheat. It sets forth, " that the defendants, devising and intending one Philo S. Shelton to injure and defraud, on the twenty-sixth day of March, A. D. 1844, at Boston aforesaid, in the county aforesaid, did unlawfully conspire, combine, confederate and agree together, the said

Shelton to injure, cheat and defraud, of his property, goods, and chattels."

Is this count, which sets forth no criminal object beyond what is imported by the words " cheat and defraud," and which omits to set forth any unlawful means, sufficient?

This presents a question, which, so far as we are aware, has not been directly settled by any adjudication of this court. The general principle applicable to criminal pleading requires that an indictment shall set forth, with technical particularity, every allegation necessary to constitute the offence charged ; and the constitution, adopting and sanctioning this principle, provides, " that no subject shall be held to answer for any crime or offence, until the same is fully, substantially and formally described to him." Looking at the indictment in the present case, by the light of these familiar principles, we should naturally expect to find more of detail in the allegations which it contains. If an indictment for murder, should allege merely that the accused had committed the crime of murder upon the person of one A. B., or, if an indictment for larceny should simply set forth, that the defendant had stolen from C. D., in neither case would the offence be set forth with the particularity and precision required by law.

It must be conceded, however, that in indictments for conspiracy a different rule prevails to some extent ; and the precise inquiry, which we have now to make, is, to what extent ? The offence of conspiracy, in one respect, is doubtless peculiar. It may, unlike most offences, be committed without any overt act. A criminal purpose to do an unlawful act, or to do a lawful act by criminal means, mutually assented to or agreed upon by two or more persons, may, by such assent and agreement, ripen into crime, although no act be done in pursuance of it.

The peculiar character of this offence has fully justified, in certain cases of conspiracy, a departure from the ordinary rules of criminal pleading. The means proposed to be used to effect a criminal purpose are not, in all cases, to be set out, and are not, in all cases, required to be proved ; nor are they,

in all cases, a necessary element of the crime of conspiracy. To a certain extent, the rules upon the subject are uncontroverted. If the alleged conspiracy be an unlawful agreement of two or more persons to do a criminal act, which is a well known and recognized offence at common law, so that by reference to it as such, and describing it by the term by which it is familiarly known, the nature of the offence is clearly indicated, in such a case, a charge of conspiracy to commit the offence, describing it in general terms, will be proper.

On the other hand, if the agreement or combination be to do an act, which is not unlawful in itself, by the use of unlawful means, those means must be particularly set forth, or the indictment will be bad. The question of doubt, and upon which there are conflicting authorities, is the case of a conspiracy to do a wrongful act, in violation of the rights of another; including under the denomination of wrongful acts, those which are unlawful, because they are in violation of some statute provision, but which are not offences at common law.

The general form of allegation, adopted in the present indictment, has been comparatively rarely used in the class of cases just adverted to ; much the greater number of such cases containing a particular statement of the illegal means, by which the object was to be effected. Our own reports furnish no authoritative decision of this matter. The cases of *Comm'th* v. *Ward,* 1 Mass. 473; *Comm'th* v. *Judd,* 2 Mass. 329; *Comm'th* v. *Warren,* 6 Mass. 72, which were cases of indictments for conspiracy, contain only *dicta.* These cases fully sustain the doctrine, that when a conspiracy is plainly and techically alleged, overt acts done in pursuance of it need not be set out, or, if set out, need not be proved; but that does not meet the question now presented. The English cases, on this point, were very few in number, until a recent period, when the question seems to have been more frequently the subject of consideration ; since which a much greater strictness has been required in indictments for conspiracy. The case of *The King* v.

*Eccles*, 3 Doug. 337, is frequently cited as an authority for a general charge of conspiracy, without any allegation of illegal means; but that case, as was said by lord Ellenborough, 13 East, 228, 231, was a conspiracy to restrain trade, and therefore a conspiracy affecting the public.   *The King* v. *Gill*, 2 Barn. & Ald. 204, is a more direct authority, and may be considered as a case in point.   In that case, however, it was alleged, in addition to the general charge of a conspiracy to cheat and defraud, that the defendants conspired to effect such cheat " by divers false pretences."   But as these pretences were not set forth with particularity, the mere statement of them may not perhaps vary the case.   The more recent English cases, however, strongly indicate a disposition to hold to a much greater strictness in indictments for conspiracy, than had formerly been supposed to be required.   The cases of *The Queen* v. *Peck*, 9 Ad. & Ell. 686 ;  *The Queen* v. *King*, 7 Ad. & Ell. (N. S.) 782, and cases there cited, sustain this suggestion.

This subject was fully considered in the court of errors of New York, in the case of *Lambert* v. *The People,* 9 Cowen, 578, which presented the same questions that arise in the present case.   The court of errors, in that case, by the casting vote of the presiding officer, adjudged the indictment to be insufficient.   The cases, relating to the point in question, and the various considerations bearing upon the whole subject, are fully and ably presented in the two opinions, delivered by senator Spencer on the one side, and senator Stebbins on the other.   Chancellor Jones concurred in the opinion of the former, declaring the indictment to be insufficient.   The case came up by appeal from the supreme court of New York, that court having sustained the indictment. The authority of this case is, of course, to be received with some qualification.   It led, at an early day, to legislative enactments materially modifying the crime of conspiracy. See Rev. Sts. of New York, II. 691.

It had been supposed, that the court of Pennsylvania, in the case of *Comm'th* v. *M'Kisson*, 8 Serg. & R. 420, had

sanctioned the form of indictment adopted in the present case; but the very recent case of *Hartmann* v. *Comm'th,* 5 Barr, 60, holds directly the contrary; adopting the principle, that, in an indictment for a conspiracy to do an act unlawful in itself, if the intended purpose be an offence at common law, it is sufficient to set out such purpose by its well known technical name; but if the object of the conspiracy be to do an act which is an offence merely by statute, the intended purpose must in such case be set forth with so much detail, as may be necessary to bring it within the description of the statute offence.

The purpose of "cheating and defrauding," which is the case now before us, does not necessarily import the commission of any indictable offence, either at common law, or by statute. It may embrace only such civil frauds as are in violation of common honesty, and for which the party is amenable to justice, not by indictment but by a civil action. Hence the necessity of alleging the purpose of the conspiracy more in detail, and with all the accompanying allegations to make it a statute offence, if the illegal means are not set forth. If the purpose of the conspiracy be to cheat by false pretences, or by false tokens, or by any other means, by which the act of cheating is made a crime punishable by statute, the means proposed to be used must be set out; not because it is necessary, in an indictment for a conspiracy, to set forth the overt acts, but because it must appear on the face of the indictment, in some form, that the object of the conspiracy is a criminal one.

We are not surprised at the disposition, so clearly indicated in the various decisions to which reference has been made, to discountenance any attempt to extend the practice of charging the offence of conspiracy in general terms. It was originally, so far as it applied to cases in which the purpose had been executed, a departure from that precision and particularity of detail, which were held requisite in other cases, and which were deemed essential to a full statement of the offence set forth in an indictment. The general form

of indictment, to the extent of alleging a conspiracy to commit a criminal act, which is known as an offence at common law, is fully sanctioned. Beyond this, the question has been a controverted one ; though, as we· have seen, the tendency of the later cases has been to require the charge to be more fully set forth. In the propriety of these decisions, we are disposed to concur ; and, called upon, as we now are, to establish a precedent for future cases of this kind, we have come to the result, that the first count of this indictment is defective, in not setting forth such allegations, as would show that the purposed " cheating and defrauding,"— the alleged object of the conspiracy, — were criminal acts. There being no allegation of any illegal means to effect the proposed object, the object itself should have been shown to be a criminal one.

The words "cheat and defraud " do not import any known common law offence. If punishable at all, as a crime, it is only when the cheat is effected by false tokens, false pretences, or the like ; to make such an object of a conspiracy a criminal act, the combination or agreement must be to cheat and defraud in some of the modes made criminal by statute ; and the indictment must contain allegations, which show that the cheat and fraud agreed upon are embraced in such statute provisions, and that if perpetrated, they would be punishable as a criminal offence.

For these reasons, we think that the first count, and the other similar and corresponding counts, are insufficient. The only remaining counts, that seemed to be relied upon by the government, are the second and others of the like form. It was urged, that the allegations contained in these counts, setting forth a conspiracy by the defendants to get into their hands and possession the goods of Philo S. Shelton, " under color and pretence of buying the same," might obviate the objection that was urged against the other counts. But these pretences are not set forth as false representations. There is no allegation that the defendants did not intend to buy, or that they did not actually buy the goods, which were deliv-

ered to them.   The fraud complained of was the not paying for the goods, and the buying without the means of paying. The result, therefore, is, that judgment must be arrested.